## WILLIAMS v. THE STATE.
[No. 21,080. Filed June 25, 1908.]

1. NEW TRIAL.—*Newly-Discovered Evidence.—Cumulative.—Result.* —Where newly-discovered evidence is merely cumulative, and, if admitted, would probably not affect the result, a new trial should not be granted. p. 631.

2. APPEAL.—*Weighing Evidence.*—The Supreme Court will not disturb a judgment founded upon conflicting evidence. p. 632.

3. APPEAL.—*Insufficient Evidence.—Review.*—The Supreme Court will reverse a case for insufficient evidence only where there is an entire failure to support some material issue; and to that end only so much of the evidence as tends to sustain the finding of the court will be considered. p. 632.

4. NEW TRIAL.—*Evidence.*—*Homicide.*—*Conspiracy.*—*Accessories.*—
Evidence showing that a mother had a violent quarrel with a
neighbor; that when her son came home she told him thereof;
.that the son, in the father's presence, loaded a gun, remarking
that it would be a good thing with which to "get" such neighbor;
that upon such neighbor's approach the son asked the father to
do the shooting, but the father answered for the son to do it,
whereupon the son killed such neighbor, sustains a finding that
the father was guilty of murder in the first degree. p. 632.

From Vanderburgh Circuit Court; *Louis O. Rasch,*
Judge.

Prosecution by the State of Indiana against Jonah Williams. From a judgment of conviction, defendant appeals.
*Affirmed.*

*Frank B. Posey,* for appellant.

*James Bingham,* Attorney-General, *A. G. Cavins, E. M.
White* and *H. M. Dowling,* for the State.

MONTGOMERY, J.—This appeal is prosecuted from a judgment convicting appellant of murder in the first degree, and
the only error assigned is in overruling his motion for a new
trial. The grounds of the motion for a new trial were that
the finding of the court is not sustained by sufficient evidence and is contrary to law, and that new evidence material
to the defense had been discovered.

The newly-discovered evidence relied upon was embodied
in an affidavit by William M. Land, the material part of
which was as follows: "That he had seen said James
1. Leigh within one-half hour prior to that time at a
saloon on the public square of Boonville, Indiana,
and heard him, said James Leigh, at said last-mentioned
time and place threaten and declare that he would kill the
whole Williams family; that at said time said Leigh had
and exhibited a pistol, and was inflamed with liquor."

The gist of this statement is that shortly before his death
the deceased was in a saloon intoxicated, exhibiting a revolver and threatening to kill the whole Williams family.
There was other evidence that Leigh was intoxicated, that

he had made threats, and that he had a revolver upon his person before and at the time of his death. If it be conceded that proper diligence is shown on behalf of appellant, a question which we do not decide, it is plain that the newly-discovered evidence must be regarded as merely cumulative, and not such as to justify the granting of a new trial. When this affidavit is considered in the light of the other evidence detailing the occurrences preceding and attending the homicide, it is clear that the facts therein affirmed could not and would not in all probability affect the result, if a new trial were granted. It is a well-settled principle that a new trial will not be awarded in a case where the proposed new evidence would probably not change the result. *Donahue* v. *State* (1905), 165 Ind. 148; *Rinkard* v. *State* (1901), 157 Ind. 534; *Smith* v. *State* (1896), 143 Ind. 685; *Sutherlin* v. *State* (1886), 108 Ind. 389; *Turner* v. *State* (1885), 102 Ind. 425; *Morel* v. *State* (1883), 89 Ind. 275.

Appellant's learned counsel earnestly insists that the finding of the court is not sustained by the evidence. It is well understood that this court will not attempt to weigh conflicting evidence, and determine its preponderance, and will be warranted in reversing a judgment upon the ground of insufficient evidence, only in case of a want of evidence to support some material element of the offense charged. *Williams* v. *State* (1905), 165 Ind. 472; *Shular* v. *State* (1903), 160 Ind. 300; *Lee* v. *State* (1901), 156 Ind. 541; *Deal* v. *State* (1895), 140 Ind. 354, 359; *Felton* v. *State* (1894), 139 Ind. 531, 533; *McCarty* v. *State* (1891), 127 Ind. 223, 225. It is only proper therefore that we examine so much of the State's evidence as tends to sustain the finding of the trial court.

The Williams family and the Leigh family occupied adjoining lots in the town of Boonville. Appellant, his wife, Minerva, and their grown son, Wesley, were dealers in "junk." Appellant was a paroled convict, and his wife and son had committed previous acts of vio-

lence. On the day preceding the homicide appellant and his wife hauled up a number of old bone fertilizer sacks, and unloaded them in the yard. Later in the day they spread them out to dry upon the partition fence between their house and the Leigh residence. Mrs. Leigh objected and thereby caused Mrs. Williams to become very offensively abusive. When Leigh returned home he requested Williams to remove them, and he said he was bound to his wife under his parole and subject to her orders. Leigh then twice requested Mrs. Williams to remove them and she refused. He threatened to knock them off, and she inquired whether he knew her son, Wesley, to which he replied in the affirmative, and then she said: "He has killed one nigger and shot another, and when he comes home I will have him fix you." Leigh picked up a stick and punched some of the sacks off the fence. Mrs. Williams went into the house, brought out a shot gun, placed it conveniently in sight, and proceeded to replace the sacks upon the fence, and thereupon Leigh went off up town and caused a warrant for her arrest to be issued. Wesley had been at Evansville during the day and returned late in the evening. Soon after his arrival his mother told him of the trouble with Leigh, and that Leigh had cursed and abused her, called her all sorts of vile and vulgar names, and Wesley said: "G— d— that s— of a b—, I am going to kill him the first chance I get." He then, in the presence of his father, took a loaded shell, and after extracting a part of the shot inserted a number of steel balls which had formed the ball bearings of a bicycle, and exhibited it to his father and said: "That will be a good thing to get the s— of a b— with," and placed the shell so loaded upon the bureau. The following day a trial was had before a justice of the peace, the full particulars of which are not given, but the officers directed the Williamses to remove the sacks from the fence. Appellant and Wesley were carrying the sacks from the fence to the rear of their lots as Leigh came home. When Leigh was com-

ing near, Wesley made a motion towards him and said to appellant: "Dad, you got to do it," and appellant said: "No, you got to do it." After reaching home Leigh called his son, and they began sawing wood in the back part of his premises. An exchange of angry words between Leigh and Wesley was started in some manner, which ended in Wesley's saying in the language of one witness: "I have killed one nigger and I guess you are his brother, and I dare you to the road to fight it out." Leigh went to a point near the well at the back steps of his house, and refused to go further, and said: "I will shoot your head off," and perhaps exhibited a pistol. Wesley said: "I will show you," jumped to the back kitchen door, and came out with a double barrel shotgun, and shot Leigh in the neck, puncturing the carotid artery and the jugular vein, causing his death within a few minutes. The wound was caused by number three shot, and by five or more larger balls which made apertures into which a small pencil could be inserted. At the time the shot was fired appellant and his wife both stood near to Wesley, and a few minutes later Minerva said: "Yes, he is dead; and we live here and pay our rent, and if they fool with us we will kill some more of the s— of b—s"; and appellant said: "If Wesley hadn't shot him I would."

The theory of the State was that Jonah, Minerva and Wesley Williams conspired to kill Leigh. The disposition of Jonah appears from this record much less vicious than that of his wife and son, and it may be that his will and action were to some extent dominated and controlled by the revengeful and savage spirit of his wife, but, in our opinion, the evidence is sufficient to sustain the theory of the State and to uphold the finding and judgment convicting appellant of murder in the first degree. No error appears in overruling appellant's motion for a new trial.

The judgment is affirmed.